UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM BREMER,<br><br>        Plaintiff,<br><br>  v.<br><br><br>COUNTY OF CONTRA COSTA, et al.,<br><br>        Defendants. | Case No. 15-cv-01895-JSC<br><br><br>**ORDER RE: COUNTY DEFENDANTS'**<br>**MOTION FOR SUMMARY JUDGMENT**<br>**PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 78 |

       This case arises out of the suicide of Plaintiff's son, David Bremer while he was a pretrial detainee at the Martinez Detention Facility in Contra Costa County.  Plaintiff contends that Defendants violated David's constitutional rights when they failed to provide adequate mental health treatment or to monitor him adequately and, as a result, failed to prevent his suicide.  Now pending before the Court is Defendants' motion for summary judgment and/or partial summary judgment.  (Dkt. No. 78.)  Having considered the parties' submissions, and having had the benefit of oral argument on November 10, 2016, the Court GRANTS Defendants' motion for summary judgment on the federal claims.  No reasonable trier of fact could find that Defendants were deliberately indifferent.  And, in addition, the officer defendants are entitled to qualified immunity on the "clearly established" prong.  Having granted summary judgment on the federal claims, the Court dismisses the state law claims without prejudice.  Without finally deciding the issue, the Court notes that the state law inquiry is different from the deliberate indifference standard and judgment does not necessarily follow from the resolution of the federal claims.

## BACKGROUND

**I.**     **Factual Background**

      A.    *David's Arrest & Booking*

      In the early hours of March 20, 2014, a Walnut Creek Police Officer responded to a report

United States District Court
Northern District of California

of a man at a drug store asking to go to the hospital.  (Dkt. No. 78-1 at 6; Dkt. No. 80-1 at 11.)[1] The officer arrested the man, David Bremer, after he attempted to run away while the officer checked on an outstanding warrant for his arrest.  (Dkt. No. 80-1 at 11.)  The officer took David to Martinez Detention Facility ("MDF").  (Dkt. No. 78-1 at 6; Dkt. No. 80-1 at 11.)

Deputy Codey was handling inmate intake at MDF when David arrived.  (Dkt. No. 78-1 at 49.)  David was responsive to his questions and did not mention "suicide or anything like that." (*Id.* at 50-51.)  As part of the next step of the intake process, Nurse Ramil Delos Angeles saw David.  (*Id.* at 77; Dkt. No. 80-1 at 20.)  Nurse Delos Angeles asked a variety of questions to assess David's physical and mental condition.  (*See* Dkt. No. 78-1 at 63-64.)  David answered that he had a history of suicidal ideation and was thinking about harming himself at the time of the interview.  (Dkt. No. 80-1 at 20.)  David also told the nurse that he had drunk alcohol and used methamphetamine that day.  (*Id.*)  Nurse Delos Angeles concluded that David was at risk of harming himself and had ineffective coping.  (*Id.*)  He referred David to mental health and recommended that staff place him in a safety cell.  (*Id.*)  A safety cell has padded walls and floors and the option of a ring to restrain an inmate that is trying to harm himself.  (Dkt. No. 78-1 at 22-23.)  The cell has a metal door with a window, and the window is covered in a tinted film to prevent inmates inside the safety cells from seeing outside, which could cause disruptions.  (Dkt. No. 78-1 at 28; Dkt. No. 80-1 at 36.)  Jail personnel believe it is the safest place in the jail.  (*Id.* at 98.)

B.    *David's Confinement*

Deputy Codey learned from another deputy that Nurse Delos Angeles had determined that David was a danger to himself.  There were no mental health workers on staff at MDF between the hours of 12:00 a.m. and 6:00 a.m., so Deputy Codey placed David in Safety Cell #2.  (Dkt. No. 78-1 at 33; Dkt. No. 80-1 at 34.)  Nurse Delos Angeles also advised the deputies to place David in a "safety smock."  (Dkt. No 78-1 at 6.)  A safety smock is a garment made of fabric that cannot be

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

torn to protect inmates from using clothing to harm themselves.  (*Id.* at 22-23.)  At 1:47 a.m., Deputy Codey had David remove all of his clothing and put on the safety smock.  (*Id.* at 6.) Deputy Codey did not restrain or shackle David while he was inside the safety cell, but placed all of David's belongings in a bag kept outside of the safety cell.  (*Id.*)  According to Deputy Codey, David never said anything to him to indicate that he was suicidal.  (*Id.* at 37.)  Deputy Codey believed that David's situation was not acute so there was no need to call mental health staff to come evaluate him right away.  (*Id.*)  However, given Nurse Delos Angeles's referral, MDF's system created a "task" for mental health staff to direct them to see David when they came on duty in the morning.  (*Id.* at 69-70, 95.)

At that point, Deputy Codey notified his supervisor that David had been placed in a safety cell then began an observation log.  (*Id.* at 6, 24, 123.)  An observation log contains notes about the inmate's health, appearance, demeanor, and any interactions with MDF staff and hangs on the outside door of each safety cell.  (*Id.* at 25, 123.)  Deputies are supposed to record notes from checks on the safety-cell inmates every 15 minutes or twice every 30 minutes.  (*Id.* at 25.) Deputies set a timer to ensure the checks occur.  (*Id.* at 26.)  They can go inside the safety cell during the check, but need not.  (*Id.* at 27.)  The observation log for David reflects notes from safety checks approximately every 15 minutes throughout the night.  (*Id.* at 123-24.)

Deputy Codey checked on David from 1:48 a.m. until 2:55 a.m.  (*Id.*)  His notes from those visits reflect that he saw David breathing during each visit, and David was mostly seated and moving his hands or feet, but began to nod off as it grew later.  (*Id.* at 27, 123; Dkt. No. 80-1 at 34.)  During the 2:43 a.m. safety check, David asked Deputy Codey for a drink of water, and the deputy responded that he would be feeding everybody shortly.  (Dkt. No. 78-1 at 42, 123.)

According to the observation log and Deputy Codey's testimony, at 3:30 a.m.—breakfast hour at MDF—Deputy Codey served David a meal.  (*Id.* at 43-44, 124; Dkt. No. 80-1 at 35.) Most MDF inmates get two packages of cereal, milk, and a spork for breakfast.  (Dkt. No. 80-1 at 35.)  Inmates in safety cells, like David, get a bologna sandwich "with the cellophane removed so they cannot harm themselves[,]" a carton of milk, and no utensils.  (*Id.*; Dkt. No. 78-1 at 126.) Deputy Codey testified that David walked to the door of the cell to get the sandwich and thanked

United States District Court
Northern District of California

3

him.  (Dkt. No. 78-1 at 46-47.)

Deputy Hayes testified, and the log reflects, that he observed David in the safety cell at 6:20 and 6:35 a.m., standing at the door and pacing around inside.  (Dkt. No. 78-1 at 124; Dkt. No. 78-2 at 17-19; Dkt. No. 80-1 at 45-46.)  Deputy Spadaro noted in the log and at his deposition that at 6:48 a.m. he observed David seated in the cell and spoke with him, at which time David told the deputy that he was "okay."  (Dkt. No. 78-1 at 34, 124.)  Deputy Spadaro does not recall seeing a sandwich or any food in David's cell at that time.  (Dkt. No. 80-1 at 51; *see* Dkt. No. 78-1 at 124.) According to Deputy Hayes, he checked on David again at 7:16 a.m., and David was sitting and awake.  (Dkt. No. 78-1 at 124; Dkt. No. 78-2 at 18-19.)  Deputy Hayes noted on the log that he again observed David at 7:31 a.m., writing that David was resting on his right side with his eyes open looking at the deputy.  (Dkt. No. 78-1 at 124; Dkt. No. 78-2 at 19.)  Deputy Hayes testified that David appeared to be breathing and there was "no overt reason to believe that he was in any distress or any danger."  (Dkt. No. 78-2 at 22; *see* Dkt. No. 78-1 at 124.)  At some point during his shift while walking through intake, Deputy Hayes recalled asking David if he was feeling better, and David responded by nodding and saying "yeah."  (Dkt. No. 78-2 at 21.)

C.    *David's Death*

At 7:30 a.m., Mental Health Specialist Margaret Pena started her rounds after having arrived at MDF at 6:00 a.m.  (Dkt. No. 80-1 at 27.)  She usually has a list of inmates in intake to see by the time she arrives in the morning.  (Dkt. No. 78-1 at 94-95.)  At 7:34 a.m., Deputy Spadaro accompanied her to Safety Cell #2, where they found David lying face down and unresponsive.  (*Id.* at 31, 54; Dkt. No. 78-2 at 35.)  Deputy Spadaro attempted to resuscitate David, tapping him on the shoulder and tugging at his safety smock to rouse him.  (Dkt. No. 80-1 at 54-55.)  When David did not respond to those efforts, Deputy Spadaro turned David onto his back, tried other efforts to rouse him, then radioed for assistance from other deputies and medical staff.  (*Id.* at 55-57; Dkt. No. 78-2 at 39.)  Several people responded.  (Dkt. No 78-2 at 39.)

Nursing staff began resuscitation efforts at 7:35 a.m. but were unsuccessful.  (*Id.* at 42.) Throughout their efforts, nurses never saw David move and did not observe a pulse.  (*Id.* at 42-46.)  Fire Department personnel arrived within minutes and attempted to resuscitate David, then

4

paramedics took over a few minutes later. (*Id.*; *see also id.* at 48-49.) The paramedics were unable to insert a new breathing tube. (*Id.* at 49.) A paramedic attributed the failure to "stiffness in [David's] jaw" and noted that "the immediate visible airway appeared to be clear." (*Id.* at 49.) The paramedics then transported David to Contra Costa County Regional Medical Center. (*Id.*). There, CPR continued. (Dkt. No. 80-1 at 61.) While continuing their attempts to revive David, doctors found a "large sandwich in the airway that appeared to be occluding the airway." (*Id.*) Their efforts were unsuccessful, and doctors pronounced David dead at 8:37 a.m. (*Id.*)

There appears to be a factual dispute about whether David's death was a suicide. (*Compare* Dkt. No. 80-1 at 41-47 (concluding that the cause of David's death was a suicide), *with* Dkt. No. 78-3 at 6 (concluding that the cause of David's death was accidental methamphetamine overdose). The Court must view the evidence in the light most favorable to Plaintiff. Accordingly, the Court assumes David's death was by suicide.

## II.    Relevant County Policies

The County has a number of policies about treatment of mental health issues among inmates and, in particular, suicide prevention. Contra Costa Health Services ("Health Services") Detention Health Services Policy No. 507 governs mental health screening and evaluations. The policy provides that all inmates receive a mental health screen at intake and may be "referred promptly" to mental health for further evaluation when needed. (Dkt. No. 78-1 at 84.) Specifically, "[i]nmate patients in crisis or having an acute psychotic episode will be immediately referred to Mental Health." (*Id.*) The policy further provides that "[s]uicidal inmate patients will be referred to Mental Health immediately. If no Mental Health staff is on duty, inmate patient will be transferred to intake safety cell with health and safety checks conducted and documented every 15 minutes." (*Id.*)

The Contra Costa County Office of the Sheriff ("County Sheriff") Policy No. 2.09.04 also addresses mentally disordered inmates. (Dkt. No. 78-1 at 79.) The policy provides that when "a mentally disordered inmate is identified," staff must begin an Observation Log and "Medical/Mental Health staff will be notified and will perform an immediate initial evaluation." (*Id.*) Based on the result of that evaluation, medical staff "may . . . [a]rrange for immediate or

5

follow-up treatment, if needed." (*Id.*)  Relatedly, the County Sheriff Policy No. 2.08.19 permits the Custody Services Bureau to place in safety cells those inmates who "pose a threat to themselves or others[.]" (*Id.* at 107.)  Under the policy, upon placing an inmate in a safety cell, staff must initiate an Observation Log and provide routine meals. (*Id.* at 108.)

Health Services also has a suicide prevention policy, No. 701A. (*Id.* at 115.)  The policy provides that "[s]taff are expected to take action anytime risk of suicide is apparent or suspected." (*Id.*)  It notes that "[a]ny inmate reported or suspected of being at increased risk for suicide will be evaluated immediately and referred to Mental Health if indicated." (*Id.*)  It goes on to state:

> If on site, Mental Health will evaluate the level of precaution required for safety and will specify the level of precaution to Custody Staff.  A potentially suicidal inmate will not be left alone while MH is summoned.
>
> In the absence of Mental Health staff, nursing staff will evaluate the inmate-patient.  In the absence of Mental Health staff the nurse will:
>
> Move inmate to Intake . . . safety cell.
>
> Place inmate in a Safety smock.
>
> Any decision about restraints will be left up to custody staff.

(*Id.* at 116.)  The policy notes that if a patient inmate is placed on suicide watch, staff must "add Suicide Watch alert to the patient health record.  Create a priority #1 task for MH to see the patient, if not already seen." (*Id.*)

The Sheriff's Office also has its own suicide prevention policy. (*Id.* at 119.)  It similarly requires that "[a]ny inmate reported or suspected of being depressed or having a mental disorder will be evaluated immediately by mental health and/or medical personnel." (*Id.*)  The Sheriff's Office policy requires custody staff to take the following steps, among others, "in the event an inmate has expressed or appears to express . . . the desire to harm themselves": (1) call for mental health staff immediately; (2) request medical staff as necessary; (3) "[s]tay with the inmate until mental health staff arrives.  If mental health staff is unavailable, medical staff should be summoned." (*Id.* at 120.)  Mental Health staff will determine if the inmate needs in-patient psychiatric care. (*Id.*)

United States District Court
Northern District of California

1    According to Juliette Kelley, Health Services program chief, the County did not staff MDF

2  with mental health workers overnight from midnight until 6:00 a.m. until the month prior to her

3  October 2016 deposition, when MDF began staffing a mental health specialist from 11:00 p.m. to

4  7:00 a.m. on weeknights.  (Dkt. No. 80-1 at 80.)  She explained that MDF made this staffing

5  decision to reduce the workload for the first mental health clinician that arrives at MDF in the

6  morning, who is often very busy.  (*See id.* at 80-81.)  When the mental health specialist is assigned

7  "priority #1 tasks," that means he or she must address those tasks—like performing mental health

8  evaluations—in the morning hours.  (*Id.* at 83.)  There may be multiple "priority #1 tasks" at one

9  time.  (*Id.*)

10    Deputies Codey, Hayes, and Spadaro, Nurse Delos Angeles, and Specialist Pena all

11  attended Suicide Prevention Training with the County prior to David's arrest and death.  (Dkt. No.

12  78-1 at 18-19, 65-66, 96-97; Dkt. No. 78-2 at 30-32; Dkt. No. 78-3 at 34.)

13  **III.    Expert Testimony**

14    Plaintiff has submitted an expert report from Correctional Consultant John O'Shaughnessy,

15  former Chief of Correctional Health Services for the Sacramento County Sheriff's Department,

16  who has over 30 years of experience in the correctional health field.  (Dkt. No. 80-1 at 84-106.)

17  After reviewing the facts of this case, including depositions, the arrest and coroner's report, and a

18  variety of County policies, Mr. O'Shaughnessy concluded that: (1) the County's failure to provide

19  mental health staff on the night shift led to David's suicide; (2) had Specialist Pena assessed David

20  when she came on duty at 6:00 a.m. instead of waiting until 7:30 a.m., he would have been

21  evaluated before committing suicide; (3) placing David in a safety cell with only intermittent

22  checks and not constant observation gave him the opportunity to commit suicide; (4) if the safety

23  cell had a video camera with constant monitoring, David would not have been able to kill himself;

24  (5) the County Sheriff was on notice that inmates frequently commit suicide by swallowing

25  material including food because its suicide prevention policy mentioned swallowing; (6) the

26  County Sheriff gave David the means of committing suicide by providing bread and bologna; (7)

27  the Individual Defendants' lack of training led to a failure to recognize the signs that David

28  intended to commit suicide; (8) the safety cell checks could have been misinterpreted because of

the small tinted window, and David might have been deceased already at the 7:31 a.m. check; and (9) the tinted window allowed David to commit suicide without anyone seeing it.  (Dkt. No. 80-1 at 94.)

Defendants have also submitted an expert report from clinical and forensic psychologist Richard Hayward, Ph.D.  (Dkt. No. 78-3 at 23-32.)  Dr. Hayward likewise reviewed the facts of the case and materials including the County policies.  (*Id.* at 23-24.)  Dr. Hayward determined that it could never be known if David intentionally committed suicide by swallowing the bread or if it was incidental to a physiological reaction to methamphetamine, but opined that: (1) the deputies and Health Services staff followed the relevant County policies and protocols, which met and exceeded nationally accepted standards for suicide prevention and correctional health and mental health care, respectively, in correctional facilities; (2) the deputies and mental health staff could not reasonably have foreseen David's death by asphyxiation due to aspiration of food is rare and this manner of suicide is remarkably rare.  (*Id.* at 27-32.)

## DISCUSSION

## I.  **Federal Claims**

### A.  First and Second Causes of Action: 14th Amendment Deliberate Indifference to Medical Needs and Interference with Familial Relations

#### 1.  *Deliberate Indifference Legal Framework*

In the first cause of action, Plaintiff alleges that the Individual Defendants violated David's Fourth and Fourteenth Amendments by failing to provide adequate medical care.  (Dkt. No. 53 ¶ 46.)  Although an arrestee's claim of failure to provide medical treatment and a pretrial detainee's claim of excessive force are evaluated under the Fourth Amendment, a pretrial detainee's claim of deliberate indifference to medical needs is evaluated under the Fourteenth Amendment.  *See Lolli v. Cnty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003); *PC v. City of Los Angeles*, No. CV 07-3413 PLA, 2012 WL 12847227, at *11 (C.D. Cal. Sept. 14, 2012) (citations omitted).  The second cause of action alleges that in violating David's right to adequate medical care, they violated Plaintiff's constitutional right to a relationship with his son.  Thus, both causes of action turn on the same underlying constitutional violation.

To prevail on a Section 1983 claim, Plaintiff must show that the alleged conduct both occurred "under color of state law" and deprived Plaintiff of a constitutional or federal statutory right. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003). The parties agree that Plaintiff's Section 1983 claims allege "deliberate indifference." *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1241 (9th Cir. 2010) ("We have long analyzed claims that correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention) under a 'deliberate indifference' standard.") (citations omitted), *overruled on other grounds by Castro v. City of Los Angeles*, 833 F.3d 1060 (2016) (en banc). Generally, to show deliberate indifference,

> [f]irst, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotation marks and citation omitted); *Castro*, 833 F.3d at 1071 (noting that a plaintiff would have to prove that he was "at substantial risk of suffering serious harm"). The "serious medical need" may include a need for psychiatric care. *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d at 1070. Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* A plaintiff need not show "his harm was substantial," *id.* at 1096; however, "an inadvertent failure to provide adequate medical care does not, by itself, state a deliberate indifference claim for § 1983 purposes." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (internal quotation and citations omitted).

"There are two separate deliberate indifference standards: *subjective*, which asks whether the defendant consciously disregarded an 'excessive risk' and *objective*, which asks whether the defendant recklessly disregarded that risk." *Petrolino v. City & Cnty. of San Francisco*, No. 16-cv-02946-RS, 2016 WL 6160181, at *2 (N.D. Cal. Oct. 24, 2016) (emphasis in original) (citation omitted); *Castro*, 833 F.3d at 1071. In *Castro v. County of Los Angeles*, a pretrial detainee establishes a Fourteenth Amendment failure-to-protect deliberate indifference claim if he can

9

show that: (1) defendant made an intentional decision with respect to the conditions of plaintiff's confinement; (2) plaintiff was exposed to a substantial risk of serious harm that could have been eliminated through reasonable and available measures; (3) defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking those measures, defendant caused plaintiff's injuries.  833 F.3d at 1071.  The objective standard is easier to prove.  *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470 (2015) ("The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable.") (emphasis in original); *Williams v. Cnty.*, No. 2:15-CV-01760-SU, 2016 WL 4745179, at *5 (D. Or. Sept. 12, 2016) (noting that "the Ninth Circuit recently set forth a less stringent formulation of the 'deliberate indifference' standard for pretrial detainee plaintiffs").

It is not clear whether the subjective or objective standard applies in this case.  *See Kinglsey*, 135 S. Ct. at 2472 (applying an objective standard to the question of whether an officer committed excessive force against a pretrial detainee); *Castro*, 833 F.3d at 1070 (applying an objective standard to a pretrial detainee's failure-to-protect claim); *Clouthier*, 591 F.3d at 1243 (applying a subjective standard to a pretrial detainee's deliberate indifference to medical needs claim involving a jail suicide).  "*Kingsley*'s holding . . . does not necessarily answer the broader question whether the objective standard applies to all § 1983 claims brought under the Fourteenth Amendment against individual defendants."  *Castro*, 833 F.3d at 1069.  In *Castro*, the Ninth Circuit distinguished excessive force claims like the one at issue in *Kingsley* from the plaintiff's failure-to-protect claim, noting that the former requires an affirmative act and the latter does not. *Id.* at 1069.  But because they both involved the same "underlying federal right[,]" the same "nature of the harm suffered"—that is, physical harm—and given the "broad wording" of *Kingsley*, the Ninth Circuit applied the objective standard to the failure-to-protect claim.  *Id.* at 1069-70.  The Ninth Circuit has not yet addressed whether *Kingsley*'s objective standard also applies to pretrial detainee's suicide claims; before *Kingsley*, it had left open the question of

10

whether the Eighth and Fourteenth Amendments required a different analysis in suicide claims. *See Lolli*, 351 F.3d at 419 n.6.  In the papers, Defendants argued that the subjective standard applies and Plaintiff did not contend otherwise.  But at oral argument, Plaintiff for the first time contended that the objective standard applies.

2.   *No Reasonable Jury Could Find that Defendants were Deliberately Indifferent*

The Court need not decide whether the subjective or objective standard applies here as no reasonable jury could find the Individual Defendants were deliberately indifferent under either standard.

As a threshold matter, there is no dispute that Plaintiff had a serious medical need (for the subjective standard) or substantial risk of serious harm (for the objective standard).  The need to provide psychiatric care requires that prison officials monitor detainees whom they know are suicidal.  *See Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1018 (9th Cir. 2010); *see also Clouthier*, 591 F.3d at 1241 (applying the deliberate indifference standard to the plaintiffs' claim that "correction facility officials violated pretrial detainees' constitutional rights by failing to address their medical needs (including suicide prevention).").  A suicide risk rises to the level of "serious medical need" for the purpose of deliberate indifference where there is a "heightened suicide risk or an attempted suicide."  *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2009) (citation omitted), *judgment vacated on other grounds sub nom. City of Reno v. Conn*, 563 U.S. 915 (2011), *op'n reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011); *see also Simmons*, 609 F.3d at 1018 ("[A] heightened suicide risk can present a serious medical need.") (citation omitted); *see, e.g.*, *Estate of Joshua Claypole v. Cnty. of San Mateo*, No. 14-cv-02730-BLF, 2016 WL 127450, at *6 (N.D. Cal. Jan. 12, 2016) (citation omitted).  Defendants appear to concede that David had a serious medical need while he was in the County's custody, and argue instead that the deputies were not aware of that need.  (*See* Dkt. No. 78 at 21.)  This evidence also suffices to meet the "substantial risk of serious harm" requirement for the purposes of the objective analysis.  The question is whether the Individual Defendants were deliberately indifferent to that medical need or risk of harm.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

b.      Deliberate Indifference – Subjective Standard

i.      Subjective Awareness

To be subjectively aware of a serious medical need, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Farmer*, 511 U.S. at 837 (emphasis added).  Thus, Plaintiff must adduce evidence raising a triable issue that Deputies Codey, Hayes, and Spadaro knew that David "was 'in substantial danger' of killing himself yet deliberately ignored such risk." *Simmons*, 609 F.3d at 1018.

Deputy Codey knew that Nurse Delos Angeles had placed David in a safety cell and referred him to Mental Health because he was a danger to himself because another deputy told him.  Deputies Hayes and Spadaro knew as much, as well, since the reason for David's placement in the safety cell—"danger to self"—was written at the top of the Observation Log to which they contributed.  But drawing all inferences in Plaintiff's favor, these are the only cues that David gave the deputies about any interest in self-harm.  There is no evidence suggesting that the deputies were aware of David's reported history of suicidal ideation or his requests to go to the hospital the evening of his arrest.  Deputies Codey and Hayes testified that David never said anything to indicate that he was actively suicidal or that his mental health situation was acute such that there was an immediate need to call Mental Health.  During the safety checks that the deputies made every 15 minutes, David was mostly seated lying down.  According to their testimony, David told Deputy Spadaro that he was feeling "okay," and answered "yes" when Deputy Hayes asked if David was feeling better.  This evidence is insufficient to support a deliberate indifference finding.

*Simmons v. Navajo County, Arizona* compels a grant of summary judgment in the deputies' favor.  In *Simmons*, parents sued the county after their son Jasper committed suicide while a pretrial detainee in the county jail.  609 F.3d at 1014.  Jasper was placed on suicide watch with constant observation after informing a detention officer that he had tried to kill himself with a razor.  *Id.* at 1014.  For several weeks, detention staff monitored Jasper, and a nurse—Nurse Jones—downgraded him to a lower-level suicide watch that required only intermittent safety

checks.  *Id.* at 1015.  Jasper repeatedly denied suicidal ideation and told staff that he was doing

better.  *Id.*  He later committed suicide.  The court affirmed summary judgment in Nurse Jones's

favor on the deliberate indifference question, noting that the evidence did not support the inference

that Nurse Jones knew Jasper was at acute risk of harm, or actively suicidal, or in suicidal crisis

when he killed himself because there was no indication that she "observed suicidal actions, heard

statements of a suicidal nature, or witnessed other evidence of [Jasper's] suicidal intent" that

would have alerted her to Jasper's impending suicidal crisis.  *Id.* at 1018-19.  The court held that

"[p]lacing a pretrial detainee on some level of suicide watch, even the highest level, does not

demonstrate a subjective awareness of a substantial risk of *imminent* suicide."  609 F.3d at 1018

(citation omitted) (emphasis in original).

     So it is here.  The deputies' own testimony that they did not have a subjective belief that

David was going to commit suicide, on its own, does not mandate summary judgment in their

favor.  *See Conn*, 591 F.3d at 1097 ("Proof of subjective awareness is not limited to the purported

recollections of the individuals involved.  Whether [an] official had the requisite knowledge of a

substantial risk is a question of fact subject to demonstration in the usual ways, including

inference from circumstantial evidence.") (internal quotation marks and citation omitted).  But

here there is no other evidence that would lead to a subjective belief, just as in *Simmons*.  To be

sure, *Simmons* is distinguishable in part: there, Jasper was on downgraded suicide watch for weeks

before he committed suicide and over that long time period did not give the officers cause to

believe he was suicidal, whereas here David spent only hours in his safety cell before his death.

But viewing the evidence in the light most favorable to Plaintiff, *see Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 255 (1986), like the nurse in *Simmons*, although the deputies were aware that

Nurse Delos Angeles had placed David in the safety cell because he answered questions indicating

he was a danger to himself, there is no evidence suggesting that they witnessed suicidal actions,

heard statements of a suicidal nature, or witnessed other any signs of David's suicidal intent that

would lead to awareness of his actively or imminently suicidal state.

     Plaintiff's contention that "David's statements were sufficient to cause Nurse Delos

Angeles to have him placed . . . in the safety cell, and they were thus sufficient for a jury to find

that the named deputies were on notice that David was at a substantial risk of committing suicide" (Dkt. No. 80 at 12), is wrong.  As a matter of law, placement on suicide watch alone does not create a subjective awareness of a substantial risk of imminent suicide, *see Simmons*, 609 F.3d at 1018, and Plaintiff does not identify any evidence to support a finding that David exhibited any other signs of intent to commit suicide.

The cases where courts have found triable issues about the defendants' subjective knowledge of a decedent's suicide involved much more circumstantial evidence that suicide was imminent and, thus, that the officials ignored an acute risk of suicide in the face of clear warning signs.  For example, in *Conn*, the defendant officers observed the decedent attempt to kill herself, and the decedent repeatedly told those officers that she would kill herself.  591 F.3d at 1092-93. In *Claypole* the decedent had killed a man for no reason, told officers that he wanted to die by lethal injection, expressed concern for what would happen to his remains, and engaged in other bizarre behavior indicative of a mental health crisis.  2016 WL 127450, at *6.  In contrast, here the only indicator the officers had was that David had been placed on suicide watch because his answers reflected that he was a danger to himself.  These facts are more like *Simmons* than *Conn* or *Claypole*, and do not raise a triable issue about the deputies' subjective knowledge of David's imminent suicide.  Thus, the Individual Defendants are entitled to judgment in their favor because no reasonable jury could find that the deputies had subjective knowledge of David's imminent suicide.

ii.      Adequate Response

Even if the Court were to find a triable issue about the deputies' subjective awareness, it would still grant judgment in their favor because there is no genuine dispute that their response was constitutionally adequate.

Plaintiff argues that the deputies' actions were constitutionally insufficient because they failed to comply with one of the County's suicide prevention policies—specifically, the County Sheriff's suicide prevention policy, which directs custody staff to call for mental health staff and stay with the inmate until mental health staff in the event the inmate expresses a desire to commit suicide.  Not so.  Conduct may violate a written policy without violating the Constitution.  *See*

*Walker v. Sumner*, 14 F.3d 1415, 1419-20 (9th Cir. 1994) (federal due process is not implicated when prison officials fail to comply with state procedural protections that are more generous than those that are constitutionally mandated), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) ("[A] prison official's failure to follow the prison's own policies, procedures, and regulations does not constitute a violation of due process, if constitutional minima are nevertheless met.").  While Plaintiffs have raised a triable issue as to whether the deputies complied to the letter with all of the County's policies, that does not necessarily mean a reasonable trier of fact could find that their conduct fell short of the constitutional minimum for care.

The evidence requires otherwise: they placed David in the safest place in the jail; they removed his personal belongings and had him wear a safety garment to ensure that he could not harm himself with them; instead of providing the meal served to the rest of MDF's population, which includes a utensil that could be used for self-harm, they served David a sandwich with the cellophane wrapper removed to prevent David from using the wrapper to harm himself; they checked on him every 15 minutes.  Plaintiff has not identified any case that holds this type of response unconstitutional.  Rather, like *Simmons*, this is "not a case where a jail official knew a pretrial detainee was *actively* suicidal but failed to ensure that precautionary measures were undertaken, or unilaterally halted such measures despite a belief that he was not yet out of the woods[.]"  609 F.3d 1018-19 (internal quotation marks and citations omitted) (emphasis added).  In short, even if there were a triable issue as to the deputies' subjective awareness of David's serious medical need, Defendants would still be entitled to summary judgment because no reasonable jury could find their response constitutionally inadequate under the subjective standard.

c.      Deliberate Indifference – Objective Standard

The Individual Defendants fare no better under the less stringent objective test.  Turning to the elements of a failure-to-protect claim from *Castro*, first it is undisputed that the Individual Defendants "made an intentional decision with respect to the conditions under which the plaintiff was confined."  833 F.3d at 1071.  They decided to place David in a cell despite learning that Nurse Delos Angeles had determined he was a danger to himself.  Further, they decided to place

United States District Court
Northern District of California

him in a safety cell wearing a safety smock, to provide him a sandwich, and to monitor him every 15 minutes.  Second, his conditions of confinement placed him "at substantial risk of suffering serious harm."  Drawing all inferences in Plaintiff's favor, as discussed above, this element is met because Plaintiff was at risk of committing suicide while in his cell.

But Plaintiff's evidence cannot satisfy the third element, which "turns on the 'facts and circumstances of [the] particular case[,]" *Kingsley*, 135 S. Ct. at 2473 (citation omitted): he cannot show that the Individual Defendants failed to take reasonable available measures to abate that risk, "even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of [their] conduct obvious[.]"  *Id.*  To the contrary, every reasonable trier of fact would have to find the deputies took reasonably available measures to abate Plaintiff's risk of suicide and there is no record evidence that would have alerted a reasonable officer that Plaintiff's suicide risk was so high that they needed to take immediate action to prevent it.  As discussed in detail above, the deputies placed Plaintiff in the safest place in the jail wearing a safety smock and checked on him every 15 minutes, and throughout the night David did not engage in any conduct that would have led a reasonable officer to appreciate how suicidal he was.  Because there were no red flags once David was inside the safety cell with the jail's suicide prevention protocols in place, it would not be obvious to a reasonable officer that David was about to commit suicide such that other measures—like constant surveillance—were necessary.

Plaintiff argues that the deputies should have been aware of the substantial risk of detainees attempting to kill themselves by swallowing because one of the County policies references it as a manner of suicide.  (*See* Dkt. No. 80-1 at 75).  Thus, they argue, if the deputies were going to feed David they should have watched him more closely.  But this was a Health Services policy that governed Health Services staff like Nurse Delos Angeles, not the deputies, which undermines Plaintiff's argument that the deputies were on notice of any swallowing risk.  Moreover, Plaintiff conceded that the deputies had to feed David and that withholding food might have been a constitutional violation.  And the Individual Defendants took objectively reasonable measures to ensure that the food they gave David was safe: they did not supply a utensil, they

1    removed the cellophane from the sandwich, and they checked on him every 15 minutes per policy.

2        Moreover, *Castro* did not overrule the *Simmons* court's holding that merely knowing that

3    someone had been placed on suicide watch—even the highest level—is insufficient to put an

4    officer on notice that the person is in imminent danger of harming themselves.  Though *Simmons*

5    addressed an officer's subjective notice that the inmate was in imminent danger, *see* 609 F.3d at

6    1018, Plaintiff offers no reason why it would demonstrate an objective awareness either, and the

7    Court sees none.  As a result, *Simmons* forecloses deliberate indifference even under the objective

8    standard.

9        Ultimately, the objective standard does not require a defendant to take *all* available

10   measures to abate a plaintiff's risk of suffering serious harm.  While it might have been a good

11   idea to monitor David constantly—while he ate or otherwise—that does not render the deputies'

12   decision not to do so reckless, or objectively unreasonable, under the circumstances presented.

13   Because David did not engage in any conduct that a reasonable officer would interpret to mean he

14   was actively suicidal, a reasonable jury could not conclude that the deputies were reckless in

15   providing David a sandwich and checking on him every 15 minutes instead of supervising him

16   constantly while he ate.  Because there is no jury question on the Individual Defendants' deliberate

17   indifference even under the objective test, they are entitled to summary judgment.

18           2.       *Qualified Immunity*

19       Defendants next contend that even if there were a triable issue as to the deputies' deliberate

20   indifference, they would still be entitled to summary judgment on the grounds of qualified

21   immunity.  The Court agrees.  Thus, regardless of whether there was a constitutional violation, the

22   Individual Defendants are still entitled to summary judgment.

23                   a.       Legal Framework

24       Under qualified immunity, government officials are shielded "from liability for civil

25   damages insofar as their conduct does not violate clearly established statutory or constitutional

26   rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

27   (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*).

28       To determine whether qualified immunity applies, the Court decides whether "(1) the

United States District Court
Northern District of California

officer's conduct violated a constitutional right; and (2) the right which was violated was clearly established at the time of the violation." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).  The Supreme Court has instructed that district courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236.  The officer is entitled to immunity if he did not violate a constitutional right or if he violated a constitutional right that was not clearly established. *Id*.

"[C]learly established law [is not to be defined] at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  Instead, in deciding whether a constitutional right was clearly established at the time of the alleged violation, a court must ask "whether the violative nature of *particular conduct* is clearly established." *Id.* (emphasis added). "The plaintiff bears the burden to show that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011).  "This inquiry, it is vital to note, must be undertaken in light of the *specific context* of the case, not as a broad general proposition[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236.  In making this determination, courts consider the state of the law at the time of the alleged violation and the information that the official possessed to determine whether a reasonable official in a particular factual situation should have been on notice that his or her conduct was illegal.  *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007).  "[W]here there is no case directly on point, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *C.B. v. City of Sonora*, 769 F.3d 1005, 1026 (9th Cir. 2014) (citation omitted).  An official's subjective beliefs are irrelevant.  *Inouye*, 504 F.3d at 712.

b.      The Deputies are Entitled to Qualified Immunity

As discussed above, there is no dispute that the officers did not violate David's constitutional right to be free from deliberate indifference.  Thus, the deputies are entitled to qualified immunity on the grounds that there has been no constitutional violation.  *See Espinosa*, 598 F.3d at 532.  But even if there had been a constitutional violation, the deputies would still be entitled to qualified immunity.

Plaintiff sufficiently shows the existence of a detainee's general Fourteenth Amendment right to be free from deliberate indifference, as before 2014 it was "clearly established that officers could not intentionally deny or delay access to medical care." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) (citation omitted). This includes the jail's duty to provide suicide prevention as part of its medical care. *See De Vincenzi v. City of Chico*, 592 F. App'x 632, 634 (9th Cir. 2015) (in the context of a motion to dismiss, noting that "the officers' duty to provide medical care, including suicide prevention, was clearly established as of December 2009") (citation omitted); *Clouthier*, 591 F.3d at 1244-45 (denying qualified immunity for a 14th Amendment claim premised on alleged deliberate indifference to a detainee's heightened risk of suicide); *Conn*, 591 F.3d at 1090 (denying summary judgment and qualified immunity to officers who witnessed an arrestee attempt suicide but failed to report the incident to jail personnel or take the arrestee to the hospital).

But Plaintiff fails to show that the right he invokes was clearly established in "the specific context of [this] case[,]" *Saucier*, 533 U.S. at 201—that a reasonable official would have understood that his conduct violated those rights. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Even if the right at issue is stated broadly for the purposes of argument—*i.e.*, the right of a suicidal pretrial detainee to be free from deliberate indifference by not being fed without constant monitoring—Plaintiff identifies no precedent clearly establishing it. In fact, Plaintiff does not cite a single case in their opposition to Defendants' qualified immunity argument. Nor did Plaintiff identify any authority at oral argument. The Court's own search did not reveal any cases, either.[2]

Because Plaintiff cannot show that David had a clearly established right to be constantly

---

[2] One district court cited *Castro* for the proposition that pretrial detainees' rights to adequate suicide prevention measures were clearly established as of 2005 and found that right was sufficient to deny the defendant's motion to dismiss on grounds of qualify immunity where officers failed to prevent the plaintiff's suicide attempt. *Williams v. Cnty.*, No. 2:15-CV-01760-SU, 2016 WL 4745179, at *5 (D. Or. Sept. 12, 2016). *Williams* involved an assertion of qualified immunity at the pleading stage, not summary judgment. Moreover, in *Williams* the defendants gave the plaintiff a razor despite knowing of his suicide risk. *Id.* at *5. No case suggests that feeding a detainee, or not watching a detainee 24/7, constitutes deliberate indifference when other safety steps have been taken.

19

1 | monitored when given food or otherwise, the deputies are entitled to qualified immunity on

2 | Plaintiff's Section 1983 claims.  *See, e.g.*, *Petrolino*, 2016 WL 6160181, at *3 (on summary

3 | judgment, concluding that the officer was entitled to qualified immunity on plaintiffs' § 1983

4 | claims where the plaintiff did not show that the decedent had a clearly established right "to be

5 | hospitalized, as opposed to being jailed under the custody of officials aware of his suicidal state").

6 |       * * *

7 |      In sum, there is no triable issue as to whether the Individual Defendants violated David's

8 | constitutional rights as no reasonable juror could find that the deputies were deliberately

9 | indifferent to his serious medical need.  This conclusion compels judgment in their favor.  And

10 | even if a triable issue remained as to the constitutional violation, the deputies would nevertheless

11 | be entitled to qualified immunity.

12 |      B.     <u>Fifth and Sixth Causes of Action: *Monell* Liability</u>

13 |          1.    *Improper Defendant*

14 |      In the fifth and sixth causes of action, Plaintiff brings Section 1983 claims directly against

15 | the County and the Sheriff's Department.  To the extent that Plaintiff wishes to bring a municipal

16 | liability claim, the proper defendant is the municipality itself—here, the County—not its sub-

17 | agencies such as the Sheriff's Department.  *See Vance v. Cnty. of Santa Clara*, 928 F. Supp. 2d

18 | 993, 996 (N.D. Cal. 1996). Thus, the municipal liability claims against the Sheriff's Department

19 | are dismissed with prejudice.

20 |          2.    *Legal Framework*

21 |      Municipalities are "persons" under Section 1983 and thus may be liable for causing a

22 | constitutional deprivation.  *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658,

23 | 690-91 (1978).  A municipality may not be sued under Section 1983 solely because an injury was

24 | inflicted by its employees or agents, however.  *Id.* at 694.  Instead, the entity is responsible only

25 | when execution of a government's policy or custom inflicts the injury.  *Id.*  To impose municipal

26 | liability under Section 1983 for a violation of constitutional rights, a plaintiff must show: (1) that

27 | the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the

28 | municipality had a policy; (3) that the policy amounts to a deliberate indifference to the plaintiff's

United States District Court
Northern District of California

20

constitutional rights; and (4) that the policy is the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40, Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). A policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing a final policy with respect to the subject matter in question." *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam) (internal quotation marks and citation omitted).

### 3.    *Plaintiff Cannot Establish Municipal Liability*

While the SAC alleges both an unconstitutional actual policy and failure to train—*i.e.*, a policy of action and one of inaction—in response to Defendants' summary judgment motion Plaintiff argues only that the County is liable for the former. In the context of jailhouse policies, "[d]eliberate indifference is a high legal standard and a showing of simple medical malpractice or jailer negligence is not enough to establish a constitutional deprivation[.]" *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Defendants argue that because there is no underlying constitutional violation against the Individual Deputies, there can be no *Monell* claim against the County. (*See* Dkt. No. 78 at 26.) But the constitutional violation that underpins Plaintiff's *Monell* deliberate indifference claim is different from the deliberate indifference claim against the Individual Defendants, so the inquiry cannot end here.

Turning to the claim alleged against the County, Defendants have presented evidence that the County had a variety of policies in place to address inmates with mental health issues and, in particular, suicide prevention. Plaintiff does not dispute these policies. Thus, this is not the type of case where the municipality lacked suicide prevention policies altogether, which might be enough to establish deliberate indifference. *See Boncher v. Brown Cnty.*, 274 F.3d 484, 486 (8th Cir. 2001) ("Jail managers who decided to take no precautions against the possibility of inmate suicide—have no policy, for example, no suicide-watch option—would be guilty of deliberate indifference . . . [because] they would be ignoring a known and serious risk of death of persons under their control for whose safety they are responsible.") (internal citations omitted); *NeSmith v. Cnty. of San Diego*, No. 15cv629 JLS (JMA), 2016 WL 4515857, at *7 (S.D. Cal. Jan. 27, 2016) (noting that the Ninth Circuit in *Conn* held that failure to adopt suicide prevention policies may

1     amount to deliberate indifference, but the Circuit later vacated that portion of the opinion and there

2     is no other Ninth Circuit authority on that point).

3            Plaintiff argues that the County nonetheless was deliberately indifferent by not placing any

4     mental health staff on duty from 12:00 p.m. to 6:00 a.m.—in other words, that the County's policy

5     of not having 24-hour, 7-day-a-week mental health staff was unconstitutional.  At oral argument,

6     Plaintiff framed the alleged violation slightly differently, contending that the County engaged in a

7     series of policy decisions that violated David's rights.  Specifically, the County violated

8     Defendant's rights because (1) it ignored its policy that required either an immediate mental health

9     evaluation or constant inmate surveillance and instead provided only intermittent checks; (2) it

10    failed to staff mental health workers overnight; (3) its mental health staff was overloaded with too

11    many "priority #1 tasks" in the morning; and (4) it chose to tint the windows of the safety cell,

12    therefore the County gave David the tool he used to kill himself and allowed it to happen.

13           The evidence is insufficient to find the County committed a constitutional violation.  There

14    is expert evidence that the County's failure to provide mental health staff on the night shift caused

15    David's suicide.  But the County is entitled to summary judgment because, like the claim against

16    the deputies, no reasonable factfinder could find the County deliberately indifferent.  As for

17    Plaintiff's complaint that the County violated its own policies by not having the deputies stay with

18    David, violating the policy itself does not show a constitutional violation.  *See Walker*, 14 F.3d at

19    1419-20; *Myers*, 97 F.3d at 94.  As for the 24-hour mental health staffing, Plaintiff notes that the

20    County now has mental health staff on duty overnight during the week.  In Plaintiff's view, the

21    County's realization that the policy in place at the time of David's death needed to be improved is

22    evidence that the old policy was unconstitutional.  Even if the Court could consider such evidence

23    despite Federal Rule of Evidence 407's proscription against considering evidence of subsequent

24    remedial measures to prove negligence or culpable conduct, good practices are not necessarily

25    constitutionally required.  Plaintiff also urges that Specialist Pena's delay in evaluating David after

26    she came on duty also reflects the County's unconstitutional policy of overburdening its mental

27    health staff.  In Plaintiff's view, the mental health specialist would have to have seen David

28    immediately and before all other inmates to comply with the Constitution.  But Plaintiff has not

1   identified any case that demonstrates this is required; indeed, at oral argument Plaintiff conceded

2   that there was no case to support the conclusion that any of Defendants' conduct was deliberately

3   indifferent.  At bottom, Plaintiff makes a policy argument that the County made the wrong choices

4   about its suicide prevention protocol.  That may well be.  But Plaintiff has not established, and no

5   reasonable factfinder could conclude, that those choices were constitutionally deficient.

6                                              *   *   *

7        No reasonable jury could find that the Individual Defendants violated David's

8   constitutional rights and, even if it could, the deputies are entitled to qualified immunity.  Further,

9   there is no jury question on Plaintiff's claim of municipal liability against the County.  Thus,

10   Defendants are entitled to summary judgment on Plaintiff's Section 1983 claims.

11   **II.       State Law Claims**

12        The Court has granted summary judgment in favor of Defendants for each of Plaintiff's

13   claims under federal law.  Only claims based on state tort law or state statute remain.

14        Supplemental jurisdiction is "purely discretionary."  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*,

15   556 U.S. 635, 639 (2009); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)

16   (same).  When all federal claims are eliminated before trial, the balance of convenience, fairness,

17   and comity usually "will point toward declining to exercise jurisdiction over the remaining state-

18   law claims." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir.), *supplemented on other*

19   *grounds*, 121 F.3d 714 (9th Cir. 1997) (quotation marks and citation omitted).  Of course,

20   "primary responsibility for developing and applying state law rests with the state courts." *Curiel*

21   *v. Barclays Capital Real Estate*, Civ. No. S-09-3074 KCD, KJM, 2010 WL 729499, at *1 (E.D.

22   Cal. Mar. 2, 2010).  "Comity and precedent in this [C]ircuit strongly disfavors exercising

23   supplemental jurisdiction."  *Heatherly v. Malika*, No. C-11-04125 DMR, 2013 WL 5754106, at *2

24   (N.D. Cal. Oct. 23, 2013) (internal quotation marks and citation omitted).  "Indeed, many courts in

25   this district have remanded state court tort claims against officers when the federal claims have

26   been resolved[,]" *Martinez v. City & Cnty. of San Francisco*, No. C-13-04197 DMR, 2014 WL

27   7387809, at *3 (N.D. Dec. 29, 2014) (collecting cases), including state law claims that remain

28   after granting summary judgment to the defendant in cases alleging officers' deliberate

United States District Court
Northern District of California

23

1    indifference.  *See, e.g.*, *Saldana v. Sayre*, No. 11-cv-03921-WHO (PR), 2014 WL 1091703, at *5

2    (N.D. Cal. Mar. 17, 2014).

3         At oral argument, Defendants asked the Court not to dismiss Plaintiff's state law claims

4    but instead to exercise supplemental jurisdiction and address the merits of the claims.  They noted

5    the parties have engaged in significant discovery in this matter to date and trial is scheduled to

6    begin in two months, so the interests of efficiency weigh against having to re-litigate from the

7    start.  Defendants also argued that the facts and theories of the state law claims are the same as

8    those underlying the federal claims.

9         Although Plaintiff's state law claims arise out of the same facts as his federal claims, the

10   law is different.  The state law claims involve overlapping immunities and state statutes that the

11   state court has a greater interest and certainly more expertise in applying than this Court does.  *See*

12   *Curiel*, 2010 WL 729499, at *1.  Moreover, the Court examined Plaintiff's state law claims in

13   depth.  While Defendants urge that judgment in their favor on the federal claims compels the same

14   conclusion on the state law claims, the Court does not necessarily think that conclusion follows.

15   *See Castro*, 833 F.3d at 1071 (noting that deliberate indifference standard requires a plaintiff to

16   "prove more than negligence"); *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081-82

17   (9th Cir. 2013) (holding that the bar for a deliberate indifference claim is much higher than that of

18   a negligence claim); *see also Schaeffer v. Gregory Vill. Partners, L.P.*, 105 F. Supp. 3d 951, 963

19   (N.D. Cal. 2015) (noting that "breach is a factual question" about whether the defendant "acted

20   reasonably in the circumstances" and "reasonableness of a defendant's actions is a quintessential

21   jury question") (citation omitted).  Accordingly, despite the significant discovery the parties have

22   engaged in throughout this litigation, the Court declines to exercise supplemental jurisdiction over

23   Plaintiff's state law claims and will therefore dismiss them without prejudice.

24

25                                    **CONCLUSION**

26        For the reasons discussed above, the Court GRANTS IN PART Defendants' motion for

27   summary judgment.  Defendants are entitled to summary judgment on the first, second, fifth, and

28   sixth causes of action that allege constitutional violations under Section 1983.  The Court

United States District Court
Northern District of California

DISMISSES without prejudice the third, seventh, eighth, and ninth causes of actions that allege claims under state law.

This Order terminates Docket No. 78.

**IT IS SO ORDERED.**

Dated: November 18, 2016

JACQUELINE SCOTT CORLEY
United States Magistrate Judge